RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JEFFREY MCKINLEY,

  *Plaintiff-Appellant,*

  *v.*

CITY OF MANSFIELD, et al.,

  *Defendants-Appellees.*

No. 03-4258

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-02339—Dan A. Polster, District Judge.

Argued: October 27, 2004

Decided and Filed: April 11, 2005

Before: KEITH, CLAY, and BRIGHT,[*] Circuit Judges.

---

## COUNSEL

**ARGUED:** Kenneth D. Myers, Cleveland, Ohio, for Appellant. Richard P. Goddard, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kenneth D. Myers, Cleveland, Ohio, for Appellant. Richard P. Goddard, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. BRIGHT, J. (p. 23), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

CLAY, Circuit Judge. Plaintiff Jeffrey McKinley, a former police officer in Mansfield, Ohio, appeals the judgment of the district court granting summary judgment to Defendants the City of Mansfield (the "City") and five of its police officers and officials.[1] The district court granted

---

[*] The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1] McKinley named as defendants the following individuals in their individual and official capacities: Lawrence Harper, the City's police chief during the events of this case; Ronald Kruder, the City's Safety Director; Philip Messer, a City police captain during the events of this case and the current police chief; and Dale Fortney, a police lieutenant

summary judgment on the grounds that McKinley had failed to establish a genuine issue of material fact as to either of the federal constitutional claims he brought in this action under 42 U.S.C. § 1983. McKinley alleges that, in the course of an internal investigation into City police officers' misuse of their radio scanners to invade citizens' privacy, the City and its police officials (1) compelled him to be a witness against himself in violation of the Fifth Amendment to the United States Constitution and (2) maliciously prosecuted him in violation of the Fourth Amendment. The district court dismissed McKinley's state law claims without prejudice.[2] We AFFIRM the district court's entry of summary judgment as to McKinley's malicious prosecution claim. But as to McKinley's Fifth Amendment claim, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.

## BACKGROUND

The following facts are viewed, as they must be, in the light most favorable to McKinley. On February 3, 2000, McKinley, a patrol officer for the Mansfield Police Department, observed an intoxicated William Noble urinating in a parking lot. Advised earlier in the day by his supervisor that all patrol officers were to issue summonses due to overcrowding at the city jail, McKinley began writing Noble a ticket. In the meantime, Noble made a cell phone call in his car as two of McKinley's colleagues, Sgt. David Nirode and officer Gary Foster, arrived on the scene. Upon his arrival, Foster told McKinley and Nirode that he overheard Noble's cell phone call on his police scanner.[3] After Foster described the substance of the phone call to McKinley and Nirode, McKinley arrested and incarcerated Noble for public indecency and intoxication.

### *The Scannergate Investigation &* Garrity *Immunity*

In late February 2000, Defendant Harper, the chief of police, directed Defendant Messer, a captain on the force, to oversee an investigation into officers' misuse of scanners. Harper launched the investigation after hearing several reports of officers using scanners to eavesdrop on citizens' phone calls; the investigation became known as "scannergate." Ultimately, the investigation would involve interviews of more than thirty police officers, searches of officers' lockers, and interviews of some civilians. Messer placed Lieutenant Detective Dale Fortney, also a defendant in this case, in command of the investigation and directed Fortney to interview certain officers, including McKinley. Fortney and his colleague, Lt. Goldsmith, conducted two interviews of McKinley, the first on February 25, 2000 (the "first interview"), and the second on March 7, 2000 (the "second interview"). Prior to the first interview, McKinley read and acknowledged the following statement in writing:

ADMINISTRATIVE PROCEEDINGS
INTERNAL AFFAIRS UNIT

You are hereby advised that you are about to be questioned as part of an official administrative investigation of the Division of Police. You will be asked specific question (sic) which will relate directly and narrowly to the performance of your official duties or fitness as an employee or member of the Division of Police. The purpose of this interview is to assist in determining whether disciplinary action

---

detective during the events of this case.

[2] McKinley's state law claims include: false arrest, abuse of process, intentional infliction of emotional distress, and breach of contract. *See* Joint Appendix ("J.A.") at 13-15 (Compl.).

[3] McKinley at one point denied that this conversation occurred but later admitted it in an interview with police that he challenges here on Fifth Amendment grounds.

is warranted, and the answers furnished may be used in disciplinary proceedings that could result in administrative action against you.

Because this is an administrative and not a criminal investigation, the Division of Police will not use any of the answers or information gained from the interview in any criminal proceeding against you. Further, the Division of Police will not release this information to any other agency without your approval and will ho[l]d it as confidential, except as mandated by an appropriate and competent authority or as necessary for disciplinary proceedings and appeals of such proceedings.

You are further advised that you are hereby ordered and required to fully and truthfully answer all questions asked of you in this interview.

Your failure to comply with this order constitutes your being in violation of the Rules and Regulations of the Division of Police . . . .

(J.A. at 71). At Fortney's behest, McKinley added: "I am giving the following statement by reason of an order from a superior officer, advising me that refusal to obey could result in disciplinary action. . . . However, it is my belief and understanding that the Division of Police requires this statement solely and exclusively for internal administrative purposes . . . ." *Id*. at 73. These promises of use immunity are consistent with the long-established rule that when a public employer conducts an internal investigation it may dismiss an employee who refuses to answer investigative questions, but it may not use any incriminating statements against the employee in a criminal prosecution regarding the matter under investigation. *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

In the first interview, Fortney asked McKinley about officers' use of scanners to eavesdrop and about the events of February 3, 2000, including the Noble phone call. McKinley claimed to have no knowledge of the alleged scanner misuse and denied that Foster or anyone else divulged the substance of the Noble call to him. McKinley affirmed the truth of his answers by providing a sworn signature on the interview transcript. The day before, Fortney had taken a statement from Nirode, who represented that Foster overheard Noble's phone call by using his scanner and then related the contents of the call to Nirode and McKinley. Four days after McKinley's first interview, Fortney took a statement from Noble, who confirmed that he had in fact made a cell phone call on February 3 during the minutes preceding his arrest. Apparently due to the inconsistencies between McKinley's first statement and the statements of Nirode and Noble (who only confirmed that a call occurred), Fortney decided to re-interview McKinley.

The second interview in reality consisted of a pre-interview session, which Fortney and Goldsmith did not record, and a recorded interview covering the same topics as the first interview. During the unrecorded pre-interview session – which lasted approximately 10-15 minutes and took place in a different room – Fortney and Goldsmith advised McKinley that they suspected him of lying in the first interview and that they were giving him another chance to tell the truth.[4] In addition, they offered that a union representative, officer Daniel Martincin, be present for the

---

[4] In his deposition, Fortney recounted: "I just told [McKinley] that it was obvious, you know, to us that he was lying and we were going to give him another chance, you know, to, even if we had to we could parade about six officers in that could tell different stories than he was telling. He needs to tell the truth and he's still under *Garrity*, he needs to tell the truth and take his chances." J.A. at 184-85 (Fortney Depo.). McKinley does not dispute this characterization of the pre-interview.

interview.[5]  Fortney and Goldsmith did not provide the written Internal Affairs Administrative Procedures statement, *see supra*, as they had at the first interview; however, Fortney advised McKinley that he was "still under *Garrity*", i.e., that just as in the first interview, "if he said things that incriminated himself . . . those could not be used against him [criminally]." J.A. at 185 (Fortney Depo.).  Finally, at the close of the pre-interview, Goldsmith read the following statement into the tape recorder:

> Today's date is Tuesday, March 7th, 2000. . . . We've called Jeff McKinley back out to be re-interviewed.  He has been advised that he's still under *Garrity*.  He was asked if he wanted a rep. present.  He stated that he did and Dan Martincin came to the Special Investigative Unit and sat on the pre-interview.  We are preparing now to re-interview Jeff McKinley and we'll go over the statement form that he gave to the investigating officers on 2/25/00.  It's been determined prior to this interview that he was not truthful at the time he gave the interview on 2/25/00.  He will be asked, again, the same questions and will give his responses.

(J.A. at 84.)

The interview then began.  McKinley does not dispute that he said the things that were recorded, but alleges that the tape and transcript of the interview do not accurately reflect *all* of what he said.  Specifically, McKinley alleges, and Fortney admits, that Fortney and Goldsmith selectively recorded McKinley's answers; when the officers suspected that an answer was false, they would stop the tape, confront McKinley with their suspicion, and suggest that he give a truthful answer.  The officers would then rewind the tape to the end of the prior question-and-answer exchange and re-ask the question that prompted the objectionable answer.  Consequently, the tape recording and transcript of the second interview omit some or all of the answers Fortney and Goldsmith deemed false and the answers that are reflected on the recording and transcript contradict much of what McKinley said in his first interview.  Specifically, McKinley admitted to using his own scanner between 1995 and 1998 to eavesdrop on cordless and cell phone calls; offered a detailed account of other officers' use of scanners to do the same; and admitted that Foster had overheard the Noble call and relayed its substance to him and Nirode.  But McKinley denied arresting Noble on the basis of his conversation with Foster, instead maintaining that he arrested Noble prior to Foster's arrival and incarcerated Noble pursuant to Nirode's representation that the jail was no longer full.

Sometime after McKinley's second interview, Fortney and Messer concluded the scannergate investigation and turned over the information they had gathered – including McKinley's statements – to Stephen Knowling, the Prosecuting Attorney for Holmes County, Ohio.  Knowling is not a defendant herein.  The Mansfield Police Department took immediate action against McKinley, first suspending him, then terminating him.  Pursuant to the police officers' collective bargaining agreement with the Department, McKinley's case went to arbitration.  Finding McKinley's termination disproportionate to the punishments meted out on other officers, the arbitrator ordered that McKinley be re-instated with back pay and benefits.

---

[5] Officer Martincin is not an attorney.

*The State Criminal Proceedings Against McKinley*

Prosecuting Attorney Knowling charged McKinley with falsification, a violation of OHIO REVISED CODE § 2921.13[6]; obstruction of official business, a violation of O.R.C. § 2921.31[7]; and interference with civil rights, a violation of O.R.C. § 2921.45. On April 11, 2000, pursuant to a summons, McKinley appeared in Mansfield Municipal Court to answer the charges. McKinley moved to dismiss the civil rights charge and the court granted the motion. Still facing the other two charges, McKinley further moved to suppress the statements recorded in his two interviews, but the court declined to do so. On July 26, 2001, after a one-day trial in which the inconsistent statements McKinley made during the two interviews played the central role – the prosecutor introduced McKinley's statements through Officer Fortney – a jury convicted him on two counts of falsification and one count of obstructing official business.

On June 25, 2002, the Richland County Court of Appeals vacated McKinley's conviction on the ground that it was error for the trial court to admit McKinley's statements. *See State v. McKinley*, No. 01CA98, 2002 WL 1732136 (Ohio Ct. App. June 25, 2002). The court considered but rejected McKinley's claim that the statements were inadmissible by virtue of the Fifth Amendment as interpreted by *Garrity*. Instead, the court based its holding of inadmissibility on its conclusion that the parties entered a contract whereby McKinley agreed to answer truthfully, and Fortney and the Police Department agreed not to use his statements in a prosecution against him. Interpreting the contract to preclude use of the statements in *any* prosecution, even a prosecution for lying during the interviews and obstructing the department's lawful investigation, the court reversed the trial court's decision to admit the statements and vacated McKinley's convictions.

*McKinley's § 1983 Action*

On November 27, 2002, McKinley filed a complaint in district court asserting claims under 42 U.S.C. § 1983 and several common law causes of action. The complaint named as defendants the city of Mansfield, Ohio, and certain of its police officials, including Lt. Fortney and then-captain now-chief Messer. This appeal is confined to the two constitutional claims McKinley brought under § 1983: (1) that Defendants maliciously prosecuted him in violation of the Fourth Amendment; and (2) that Defendants violated his Fifth Amendment "rights to be free from self incrimination" by compelling him in the second interview to make incriminating statements as to falsification and obstruction, which statements were later used at his trial for those crimes. Brief of Appellant at 3-4. On February 10, 2003, Defendants filed a motion for summary judgment. In response, McKinley filed a motion for leave to conduct discovery and to hold in abeyance a decision on Defendants' summary judgment motion. The district court granted very limited discovery, permitting McKinley to depose Defendant Fortney only and restricting the topic of the deposition to the second interview. At the conclusion of discovery, McKinley filed (1) a response to Defendants' motion for summary judgment, (2) a motion to strike the transcript of the second interview from Defendants' summary judgment motion, and (3) a motion for sanctions. Defendants replied with their own cross motion for sanctions.

---

[6] Ohio's Falsification statute provides, in relevant part: "No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies: (1) the statement is made in any official proceeding. . . . (3) The statement is made with purpose to mislead a public official in performing the public official's official function." O.R.C. § 2921.13(A)(1) & (3).

[7] Ohio's Obstruction of Official Business statute provides, in relevant part: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." O.R.C. § 2921.31(A).

The court denied McKinley's motion to strike and denied both parties' motions for sanctions. The district court granted summary judgment in Defendants' favor, dismissing without prejudice Plaintiff's state law causes of action.

### STANDARD OF REVIEW

This Court reviews a district court's decision to grant summary judgment *de novo*. *E.g., Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, we view the facts in the light most favorable to McKinley.

### DISCUSSION

### I.  Compelled Self-Incrimination

Before proceeding to our analysis of what McKinley challenges under the Fifth Amendment, we note what he does *not* challenge. McKinley accepts the general rule that the Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice. *See United States v. Wong*, 431 U.S. 174, 178 (1977) ("The Fifth Amendment privilege does not condone perjury."); *see also United States v. Apfelbaum*, 445 U.S. 115, 131 (1980) (holding that "[n]either the [federal use] immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements"); *United States v. Mandujano*, 425 U.S. 564, 576 (1976) ("In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever."). This rule applies with equal force when the statements at issue were made pursuant to a grant of *Garrity* immunity during the course of a public employer's investigation of its own. *See United States v. Veal*, 153 F.3d 1233, 1243-44 (11th Cir. 1998), *cert. denied*, 526 U.S. 1147 (1999). As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation. *Garrity*, 385 U.S. at 500. However, *Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it. *See Veal*, 153 F.3d at 1243-44.

Consequently, McKinley acknowledges that the statements he made during the course of the first interview with Fortney and Goldsmith, while off limits in any subsequent prosecution regarding the scannergate crimes, were fair game for his falsification and obstruction prosecutions. But the statements he made at the *second* interview, McKinley suggests, are of an entirely different character. No longer a mere *Garrity* witness, McKinley alleges that by the time of the second interview on March 7, he was the target of a falsification and obstruction investigation. *See* Brief of Appellant at 42-45. After assuring McKinley that his second interview would be conducted according to the same rules as the first, i.e., that the promise of *Garrity* immunity remained in effect, McKinley alleges that Fortney and Goldsmith compelled him to make statements that incriminated him vis-à-vis the crimes of falsification and obstruction. Then, despite the officers' promise of *Garrity* immunity, these statements were used against him at a trial for falsification and obstruction – a straightforward violation, McKinley asserts, of the Fifth Amendment. The record is clear that the manner of compulsion, while not physical coercion, was nonetheless severe: if McKinley refused to answer, he would face departmental disciplinary proceedings and termination of employment.

The district court dismissed McKinley's reasoning on several grounds. First, the court concluded, "[i]t is the Special Prosecutor who used the transcripts to establish the state's case against him – not defendants." J.A. at 273. (Dist. Ct. Op.) Without evidence that Defendants participated in the Prosecutor's decision, or induced him to rely on the allegedly coerced statements, the court rejected as a matter of law McKinley's theory of police liability. As a second rationale for rejecting McKinley's claim, the court explained that the Ohio Court of Appeals's decision precluded any further adjudication on the issue of whether *Garrity* prohibited the use of McKinley's statements at his criminal trial. The Ohio court determined that *Garrity* itself did not prohibit trial use of the statements – because the prosecution was for false statements and obstruction, not scannergate – but found for McKinley on contractual immunity grounds. *See State v. McKinley*, No. 01CA98, 2002 WL 1732136 (Ohio Ct. App. June 5, 2002).

Finding itself bound by the Ohio court's reading of *Garrity* – on the theory that McKinley could not use his § 1983 civil action to re-litigate issues decided in his state criminal case – the district court rejected McKinley's claim on this basis as well. Finally, the court concluded that McKinley's claim would fail on the merits in any event because he could show no violation of *Garrity* or the Fifth Amendment, let alone a violation of a clearly established constitutional right. The basis for this conclusion was that *Garrity* permits use of employer-compelled statements in a later false statement and obstruction prosecution. The court apparently declined to address McKinley's primary argument – that his role in the second interview was that of a falsification and obstruction suspect, rather than a traditional *Garrity* informant, and therefore that it was a violation of the Fifth Amendment to use his compelled statements from the second interview at the false statement and obstruction trial.

### A.

Initially, we must determine whether, as the district court held, McKinley is precluded from making his Fifth Amendment claim in this § 1983 action because the Ohio Court of Appeals rejected the claim in his state criminal appeal.[8] *See State v. McKinley*, No. 01CA98, 2002 WL 1732136 (Ohio Ct. App. June 5, 2002) (unpublished opinion).

As a general rule, a federal civil action brought under § 1983 is not a venue for re-litigating issues that were decided in a prior state criminal case. *See Allen v. McCurry*, 449 U.S. 90, 103-105 (1980) (holding that the principles of collateral estoppel and res judicata apply in § 1983 actions). Because McKinley's state proceedings occurred in Ohio, we must consult Ohio's law of collateral estoppel (also known as "issue preclusion") to determine whether the state appeals court's decision precludes us from considering McKinley's Fifth Amendment claim. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) (instructing federal courts to apply the collateral estoppel law of the state which issued the prior judgment); *see also Haring v. Prosise*, 462 U.S. 306, 313-316 (1983) (same); 28 U.S.C. § 1738 (federal courts must give full faith and credit to state court judgments).

In Ohio, "issue preclusion precludes the relitigation of an issue that has been actually and necessarily litigated and determined in a prior action." *MetroHealth Med. Ctr. v. Hoffmann-Laroche, Inc.*, 685 N.E.2d 529, 533 (Ohio 1997) (internal quotation marks and citations omitted).[9]

---

[8] The district court raised the issue of collateral estoppel *sua sponte*. *See* J.A. at 278 (Dist. Ct. Op.). Because we conclude that collateral estoppel does not bar McKinley from raising his Fifth Amendment claim here, we do not consider whether the district court's decision to raise the question *sua sponte* was erroneous.

[9] We observe that this understanding of collateral estoppel is consonant with the Supreme Court's view of the doctrine as it applies in the § 1983 arena. As the Court put it in *Allen*: "Under collateral estoppel, once a court has decided an issue or fact *necessary to its judgment*, that decision may preclude relitigation of the issue in a suit on a

We cannot bar McKinley from asserting his Fifth Amendment claim unless the Ohio appeals court considered the "identical" claim and the court's rejection of the claim was "essential [to its] judgment." *Goodson v. McDonough Power Equip.*, *Inc.*, 443 N.E.2d 978, 985 (Ohio 1983). The Ohio Court of Appeals vacated McKinley's falsification and obstruction convictions on the limited grounds that the state's use of his statements at the trial for those crimes constituted a breach of the police department's promise not to use "any of [his] answers . . . from the interview . . . in any criminal proceeding." *McKinley*, 2002 WL 1732136, at \*3 (quoting the departmental warning Fortney provided to McKinley). While it is true that the court concluded that *Garrity*, as opposed to the police department's more generous immunity contract, would permit use of the statements at a trial for falsification and obstruction, *see id*. at \*2-\*3, this conclusion was in no sense "essential" to its judgment, the essence of which was that McKinley's convictions were invalid on contractual immunity grounds. *See Goodson*, *supra*, at 985. Indeed, the Ohio appeals court's comments regarding *Garrity* were mere *dicta*. Accordingly, we hold that McKinley may raise his Fifth Amendment claim in this action.

**B.**

Section 1983 authorizes anyone deprived of her federal constitutional or statutory rights by state officials to bring a civil action for damages against such officials. 42 U.S.C. § 1983. However a defendant in a § 1983 action may raise the affirmative defense of qualified immunity, which "shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known.'" *Gardenshire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

But as a pre-cursor to the *Harlow* qualified immunity analysis, a court must first determine whether *any* constitutional violation occurred, let alone the violation of a clearly established right. *E.g., Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999). Consequently, if we find no constitutional violation, then the case must be dismissed at this threshold stage because § 1983 is inapplicable on its face. *Katz*, 533 U.S. at 201; *see also* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . *subjects*, *or causes to be subjected*, any citizen of the United States . . . *to the deprivation of any rights . . . secured by the Constitution* . . . shall be liable.") (emphasis added). Where a constitutional violation exists, the court must next determine whether the right infringed was clearly established – by decisions of the Supreme Court, this Court, or other Courts of Appeal – at the time the defendant allegedly infringed it. *See Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993)). Finally, if the right is clearly established, we cannot impose liability on a state official unless "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[]." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)). We now consider McKinley's Fifth Amendment claim and whether any of the defendants are entitled to qualified immunity.

---

different cause of action involving a party to the first case." *Allen*, 449 U.S. at 94 (emphasis added) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).

## C.

We conclude that there is a genuine issue of material fact as to whether, at the time of McKinley's second interview, he was the target of an independent falsification and obstruction investigation, and no longer a mere *Garrity* witness. We conclude that there is also a genuine issue of material fact as to whether Defendants compelled McKinley to make statements that would incriminate him as to the crimes of falsification and obstruction. If McKinley was in fact a target of such an investigation, and if Fortney and Goldsmith in fact forced him to make the incriminating statements[10] later used against him in his trial for falsification and obstruction, he was "compelled in [a] criminal case to be a witness against himself." U.S. CONST. amend V.

This core protection against forced self-incrimination, binding on the federal government by virtue of the Fifth Amendment itself, is applicable to the states by virtue of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). While the Supreme Court has devised procedural safeguards to guard against forced self-incrimination before judicial proceedings begin, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and while until recently courts interpreted the Fifth Amendment to prohibit coercive questioning *ipso facto*, *see Cooper v. Dupnik*, 963 F.2d 1220, 1242-44 (9th Cir.) (*en banc*), *cert. denied*, 506 U.S. 953 (1992) (sustaining a § 1983 action against police officers even though the plaintiff's coerced statements were not used at any proceeding), it is now clear that "mere coercion does not violate the . . . Self-Incrimination Clause absent use of the compelled statements in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion).[11] It is only once compelled incriminating statements are used in a criminal proceeding, as a plurality of six justices held in *Chavez v. Martinez*, that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action.[12] *Id.* at 769, 772-73. *See also Lingler v. Fechko*, 312 F.3d 237, 238-40 (6th Cir. 2002) (finding no Fifth Amendment violation sufficient to sustain a § 1983 action where police officer-employees who had made incriminating statements in compulsory interviews with superiors were never prosecuted). In this case, it cannot be disputed that McKinley's statements from the second interview were used as evidence against him at trial. J.A. at 165 (trial transcript).

Yet to prevail at the summary judgment stage in this § 1983 action, McKinley must also show that the statements are legally entitled to Fifth Amendment protection in the first place, i.e., that there was in fact a violation of his Fifth Amendment right to be free from forced self-incrimination; and, moreover, that the named defendants are proper defendants, i.e., that they caused the Fifth Amendment violation in question. *See*, *e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (holding that a § 1983 plaintiff must first identify and prove that a deprivation of constitutional magnitude occurred); *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (holding that § 1983 reaches only those public officials who *cause* deprivations of constitutional rights); 42 U.S.C. § 1983 (making liable "every person who . . . *subjects*, *or causes to be subjected*, any citizen of the United States [to the deprivation of any constitutional right]") (emphasis added). The district court rejected

---

[10] Lest there be any confusion regarding whether McKinley's answers in the second interview in fact incriminated him as to the crimes of falsification and obstruction, we observe that he not only provided answers that materially contradicted his earlier answers but also expressly admitted being untruthful in the first interview and doing so with the purpose of protecting fellow officers. *See* J.A. at 89-94 (transcript of second interview).

[11] The *Chavez* decision may leave room for a challenge to the use of coerced statements in a grand jury proceeding, *see Chavez*, 538 U.S. at 766-67 (declining to decide when a "criminal case" begins), however the thrust of the opinion rests on the view that the Fifth Amendment is a trial protection. *Id.* at 766-68.

[12] Agreeing on this specific holding were Chief Justice Rehnquist and Justices Thomas, O'Connor, Scalia, Souter, and Breyer. *See id.* at 763, 773 (Op. of Thomas, J., joined by Rhenquist, C.J., and O'Connor and Scalia, J.J.); *id.* at 777-79 (Op. of Souter, J., joined by Breyer, J.).

McKinley's claim on both grounds. The court held that Defendants did not violate McKinley's Fifth Amendment rights because the Fifth Amendment's protection against forced self-incrimination does not extend to perjury or false statements. The court further held that in any event, even if any of the defendants had compelled McKinley to incriminate himself, it is only prosecutors who "use" suspects' incriminating statements against them in criminal proceedings; consequently, the named defendants, all police officers and officials, did not cause the constitutional injury McKinley alleges.

We address first McKinley's argument that Defendants violated his Fifth Amendment rights; second, his argument that Defendants, although they are police officers, may nonetheless be held liable under § 1983 for violating his Fifth Amendment rights; and, finally, his assertion that those rights were clearly established at the time they were infringed.

**1.**

With respect to the substance of McKinley's claim that Defendants "compelled [him] in [a] criminal case to be a witness against himself," U.S. CONST. amend. V., we note again that McKinley objects only to the use at trial of the statements he made during the second interview. This position reflects an accurate understanding of *Garrity*, which would permit the use – in a false statement, perjury, or obstruction trial – of the statements he made during the *first* interview since it was conducted pursuant to the "matter under investigation", i.e., scannergate. *See United States v. Veal*, 153 F.3d 1233, 1242-43 (11th Cir. 1998), *cert. denied*, 526 U.S. 1147 (1999) (holding that a *Garrity*-immunized statement could serve as evidence in a prosecution for falsification and obstruction). Focusing his challenge only on the second interview, McKinley alleges that Fortney at that point viewed him as having committed the crimes of falsification and obstruction by lying during the first interview. Consequently, McKinley asserts, Fortney and Goldsmith violated the rule of *Garrity* because *Garrity* extends as far as "the matter being investigated," *Veal*, 153 F.3d at 1243, and "the matter" now included a separate investigation of McKinley. In any event, McKinley posits, Fortney's conduct violated the Fifth Amendment because, having openly accused McKinley of committing certain crimes (falsification and obstruction), Fortney then compelled McKinley to inculpate himself in the commission of those crimes (by threatening McKinley with termination if he did not admit his role in scannergate and thus materially contradict his earlier statements). And, finally, the fruits of the compulsory interview were introduced against McKinley at a trial for those crimes.[13]

There is evidence in the record sufficient to present genuine issues of material fact as to whether Fortney conducted the second interview of McKinley because he suspected that McKinley had committed falsification and obstruction during the first one and as to whether, during the second interview, Fortney and Goldsmith compelled McKinley to incriminate himself insofar as the crimes of falsification and obstruction are concerned. As a starting point, during the 10-15 minute pre-interview before the second interview, Fortney accused McKinley of lying during his first interview and advised him that he now had the chance to come clean and tell the truth. J.A. at 182-85 (Fortney Depo);[14] Fortney and Goldsmith then elicited, without the tape recorder running, an account from

---

[13] McKinley also argues that Fortney's failure to read him the *Miranda* warnings at the outset of the second interview is actionable under § 1983. On the contrary, a § 1983 action on that basis is squarely foreclosed by the Supreme Court's decision two terms ago in *Chavez*. *Chavez*, 538 U.S. at 772 ("Accordingly, Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action.") (plurality opinion).

[14] In his deposition testimony, Fortney explained:

We had compared Patrolman McKinley's statement to, you know, other statements we had received and there was, it was obvious to us that there were differences and we felt by the number of people giving differences that he was being untruthful so we explained to him that we're gonna give him

McKinley that satisfied them.  *Id*.  Second, Fortney admits that he advised McKinley that he was still under the protection of *Garrity*, so that although McKinley was required to answer the officers' questions, his statements could not be used against him in a criminal proceeding.  *Id*. at 185.  Third, McKinley deduced from Fortney's representation regarding *Garrity* that, just as with the first interview, he would have been disciplined and likely terminated if he did not agree to answer questions at the second interview.  While Fortney could not recall whether he instructed McKinley to sign the immunity documents provided during the second interview, *see id*. at 185-86 (Fortney Depo. at 12-13), we conclude that Fortney's representation to McKinley that he "needs to tell the truth and he's still under *Garrity*,"[15] *id*. at 185, is sufficient to defeat summary judgment on the issue of whether McKinley's presence at the interview was compulsory.  Moreover, Defendants do not suggest that McKinley's participation in the second interview was voluntary, instead admitting in their brief that his second interview was also "*Garrity*-immunized."  *See* Brief of Appellees at 35.  Finally, our conclusion on this point is only strengthened by the conditions of the first interview, in which McKinley was informed that failure to answer truthfully "could result in disciplinary action" and "possible job forfeiture."  *Id*. at 161-62 (immunity documents).

A fourth relevant fact is that at the beginning of the second interview, when Fortney first began recording the conversation, Goldsmith read a statement into the microphone that included another accusation of lying, to wit:

> We've called Jeff McKinley back out to be re-interviewed.  He has been advised the he's still under *Garrity*. He was asked if he wanted a rep. present.  He stated that he did and Dan Martincin came to the Special Investigative Unit and sat on the pre-interview.[16]  We are preparing now to re-interview Jeff McKinley and we'll go over the statement form that he gave to the investigating officers on 2/25/00.  It's been determined prior to this interview that [McKinley] was not truthful at the time he gave the interview on 2/25/00.  He will be asked, again, the same questions and will give his responses.

*Id*. at 84.  Fifth, during the course of the interview, Fortney and Goldsmith at least occasionally stopped the tape, pointed out inconsistencies between what McKinley was currently saying and what he had said in the unrecorded pre-interview, accused McKinley of lying, and encouraged him to tell

---

> another chance to give us a statement and come clean and tell us the truth this time . . . I just told him that it was obvious, you know, to us that he was lying and we were going to give him another chance, you know, to, even if we had to we could parade about six officers in that could tell different stories than he was telling.  He needs to tell the truth and he's still under *Garrity*, he needs to tell the truth and take his chances.

J.A. at 184-85 (Fortney Depo.).

[15] Fortney's interpretation of this *Garrity* warning, according to his deposition testimony, was "[t]hat McKinley had to answer our questions truthfully and that if he said things that incriminated himself against the – the case we're investigating, you know, i.e., Scanner Gate, that those could not be used against him."  J.A. at 185 (Fortney Depo.).  This may suggest that Fortney in fact viewed the second interview as no more than an additional chapter in the scannergate inquiry.  But by no means does Fortney's *post hoc* self-interested statement counteract the evidence in support of McKinley's allegation that in the second interview, he was under investigation for lying.  Which representation of the facts – Fortney's or McKinley's – is correct is a question committed to the jury.

[16] Officer Martincin's presence is relevant on the issue whether Fortney and Goldsmith compelled McKinley to incriminate himself.  The record discloses that (1) Martincin is not an attorney; and (2) although he was present and could be consulted, he apparently could not terminate the interview.  Moreover, at no point have Defendants suggested that McKinley could have refused to answer questions without sanction.  As our discussion indicates, the totality of the evidence surrounding the two interviews indicates that there are genuine issues of material fact regarding whether Fortney and Goldsmith suspected McKinley of falsification and obstruction and compelled him to give incriminating answers to their questions at the second interview.

the truth. *See id.* at 192-203 (Fortney Depo.). At this stage, McKinley asserts that the message Fortney and Goldsmith sent to him was that the "truth" was what he had said during the pre-interview; Fortney and Goldsmith, McKinley submits, were not satisfied until all of his answers matched the answers he gave in the unrecorded pre-interview.[17] Fortney does not dispute that the officers recorded over what they concluded were McKinley's untruthful answers with the answers he gave after they "encouraged him to tell the truth."[18] J.A. at 201.

Finally, in affidavits submitted to the district court, both Defendant Fortney and Defendant Messer – who was the Captain in charge of the scannergate investigation – made attestations that could support a finding that, prior to the second interview, they suspected McKinley of committing falsification and obstruction.[19]

Together, these facts suffice to establish a genuine issue of material fact as to whether Fortney decided to conduct a second interview of McKinley not merely to glean further information regarding scannergate but also because he suspected that McKinley had lied in the first interview

---

[17] McKinley does not challenge this "selective recording" as such, but appears to assert that it constitutes evidence of Fortney and Goldsmith's coercive tactics. We express no view on whether these tactics might be independently attacked as infringing on McKinley's Fourteenth Amendment due process rights. We do agree, however, that the method of questioning in this case is probative of coercion and is therefore relevant to McKinley's Fifth Amendment claim.

[18] The following exchange between McKinley's counsel and Fortney bears this out:

Q:    But for the most part you felt that his answers in the [unrecorded] pre-interview were accurate compared with the statements of the other officers?
A:    Yes, sir.
Q:    So you thought those where the truthful answers?
A:    Yes, sir.
Q:    And . . . those answers that you determined were truthful in the pre-interview, those contradicted some of the answers he had given you in the first statement [from the first interview], correct?
A:    Yes, sir.
Q:    Okay. And so as you're going along and he answers questions on the tape that are different from the ones you had determined to be the truth in the pre-interview, you turned the tape off, reminded him of what was said in the pre-interview and erased his previous answer and gave him a chance to answer what you thought were the truthful answers based on the pre-interview, correct?
A:    Yes.
. . .
Q:    Okay. And so you were encouraging him to re-think that answer and give you a different one, right?
A:    We were just encouraging him to tell the truth.
Q:    But you had already determined that the truth was the answers he gave you previously in the pre-interview, right?
A:    Mostly, yes.
Q:    Okay. And so you were encouraging him to go back to that version to match what he had said in the pre-interview, right?
A:    I can just say we encouraged him to tell the truth and, yes, we did believe that the pre-interview was mostly truthful.
Q:    Okay. And that's the part of it you wanted him to say on tape.
A:    Yes.

J.A. at 199-201 (Fortney Depo.).

[19] *See* J.A. at 243 (Fortney Aff.) ("The information obtained from Officers McKinley, Foster, and Nirode, and Mr. Noble during this investigation established that Officer McKinley had lied during his February 25, 2000 statement to Lt. Goldsmith and me and had committed the crimes of falsification and obstructing official business."); *id.* at 66 (Messer Aff.) ("After I had received additional information in the course of the investigation, Lt. Fortney took a second statement from McKinley on March 7, 2000.").

and had thereby committed falsification and obstruction. In addition, these facts present a genuine issue of material fact regarding whether Fortney and Goldsmith compelled McKinley to make incriminating statements as to the crimes of falsification and obstruction.

These issues are material because if McKinley was a target and not a mere *Garrity* witness, the Fifth Amendment would preclude use, at the falsification and obstruction trial, of any incriminating statements he was compelled to make in the second interview. This conclusion follows from *Garrity* and from conventional Fifth Amendment principles. As McKinley correctly points out, *Garrity* extends as far as "the matter being investigated." *Veal*, 153 F.3d at 1243. Consequently, where "the matter" includes a subsidiary investigation into the truth of an officer's statements, a decision by internal affairs investigators to compel the officer to make statements and admissions to the effect that he lied – which statements and admissions are then used to convict him of lying in a prior interview – amounts to a direct violation of *Garrity*. This is not a novel or ingenious interpretation of *Garrity* but rather the only way to read the opinion if we are to give meaningful effect to the Fifth Amendment.

Like the district court, we find the Eleventh Circuit's decision in *United States v. Veal* to be instructive on this question. In *Veal*, Miami police officers under investigation by the police department and the FBI for murdering a suspect and covering it up were prosecuted for the crime of making false statements during interviews conducted pursuant to the departmental investigation. 153 F.3d at 1237-39. The Eleventh Circuit rejected the officers' contention that *Garrity* prohibited use of their statements at the trial for these collateral crimes. *Id*. at 1243-44. Significantly, in *Veal* the government built its false statement and obstruction case not by reliance on subsequent interviews of the officers but on the basis of physical evidence and experts' analyses of the crime scene; this evidence tended to incriminate the officers and expose their cover-up. *See id*. at 1237-38. Indeed, the investigators in *Veal* did not conduct later interviews of the officers in which they accused the officers of lying during prior interviews. Consequently, the officers in *Veal* did not – and *could* not – present the Fifth Amendment claim that McKinley asserts here. Rather, the officers in *Veal* submitted that "statements protected by *Garrity* are forever barred from use in any prosecution, including one for perjury, false statements, or obstruction of justice." *Id*. at 1240. By contrast, McKinley *concedes* that his answers in the *first* interview are admissible against him in a prosecution for falsification and obstruction of justice.

The other cases the district court relied upon to deny McKinley's claim are similarly distinguishable; the defendants in those cases did not suggest that the police or their employers compelled them to incriminate themselves in subsequent interviews as to the crimes of perjury, making false statements, or obstruction of justice. *See United States ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1974) ("[A]ppellant was not prosecuted for past criminal activity based on what he was forced to reveal about himself; he was prosecuted for the commission of a crime while testifying, i.e. perjury."); *United States v. Devitt*, 499 F.2d 135, 142 (7th Cir. 1974), *cert. denied*, 421 U.S. 975 (1975) (observing same). Where such a claim is colorable, as it is here, the Fifth Amendment is surely implicated. In *Garrity*, the Supreme Court reasoned that questioning a public employee under threat of termination may not lead to the use of the employee's statements at trial. *See* 385 U.S. at 497-98 ("The choice given petitioners was either to forfeit their jobs or to incriminate themselves . . . We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained under our prior decisions."). But the Court has not limited this Fifth Amendment principle to cases where the state threatens job loss; the rationale of *Garrity* applies with equal force where the state exacts answers from its contractors under threat of terminating their contracts, *see Lefkowitz v. Turley*, 414 U.S. 70, 78-81 (1973), and where a state "impose[s] substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) (holding that New York could not strip a state Democratic party official of his office on the

grounds that he refused to waive his Fifth Amendment privilege against self-incrimination before a grand jury).

Consistent with these precedents, we conclude that McKinley alleges a classic violation of the Fifth Amendment: a decision by internal affairs officers to compel an officer suspected of specific crimes to incriminate himself as to *those* crimes, followed by the subsequent use of the incriminating statements in a trial for *those* crimes. It makes no difference that the crimes at issue in this case are falsification and obstruction, rather than assault or robbery. It similarly makes no difference, as the Supreme Court's cases make clear, that the manner of compulsion was the threat of disciplinary action and termination of employment, rather than physical coercion. Indeed, if McKinley reasonably believed that Defendants would impose substantial penalties on him – such as job loss or disciplinary sanctions[20] – if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself in violation of the Fifth Amendment. *Lefkowitz v. Cunningham*, 431 U.S. at 805-806. On the facts before us, we cannot conclude as a matter of law that McKinley's belief that he would face severe sanctions for declining to incriminate himself was unreasonable.

Finally, we have made clear our view that if Fortney or any other defendants suspected McKinley of falsification and obstruction – a factual question which must be submitted to a jury – the second interview cannot be viewed as simply part of scannergate. In other words, there is a genuine question as to whether the "matter under investigation" was no longer limited to the misuse of scanners, but had broadened to include an investigation of McKinley for crimes committed by lying during the scannergate inquiry. In sum, because McKinley's incriminating statements were used at his trial for falsification and obstruction, all that is required of McKinley at the summary judgment stage is that he present sufficient evidence to create genuine issues of material fact on the questions whether any of the defendants suspected him of committing falsification and obstruction and whether any of the defendants compelled him to incriminate himself as to those crimes. At least as to Defendant Fortney – the only named defendant who participated in the second interview – we hold that McKinley presents sufficient evidence to survive summary judgment on these questions.[21]

---

[20] In addressing this question, the D.C. Circuit held that an officer claiming the protection of *Garrity* "must have in fact believed [his] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988). The Eleventh Circuit has reasoned similarly. *See United States v. Vangates*, 287 F.3d 1315, 1321-22 (11th Cir. 2002) (adopting *Friedrick*'s approach). We decline to require proof that McKinley reasonably believed he would be fired. It is sufficient, we think, for a jury to conclude that he reasonably believed that substantial penalties were likely to result from his refusal to answer questions during the second interview; although job termination is surely a "substantial penalty," so, too, are other employer actions, such as ordering a demotion or suspension. *See Dwan v. City of Boston*, 329 F.3d 275, 279 (1st Cir. 2003) (observing that to prove his incriminating statements were compelled, an employee must show that he was "threatened or forewarned of [a] sanction for refusing to testify"). Relevant to the question whether McKinley reasonably believed he faced a threat of substantial penalties are the totality of the circumstances surrounding the second interview and the circumstances of the first interview, to the extent they are probative of McKinley's state of mind, and whether that state of mind was reasonable, during the second. *See* discussion *supra*.

[21] We consider McKinley's Fifth Amendment claim as against the other individual defendants and the City *infra* at Part I.D of this opinion.

**2.**

Next we must consider the district court's conclusion that McKinley's § 1983 action cannot lie against Defendants, who are police officers, because "the only representative of the State who 'used' [McKinley's] statements against him in court was the Special Prosecutor." J.A. at 275 (Dist. Ct. Op.). We reject this interpretation of the Fifth Amendment for several reasons.

First, despite its superficial appeal, the district court's bright line rule lacks support in the case law. We are not aware of any reported decision in which a federal court dismissed a § 1983 action based on an alleged Fifth Amendment violation solely on the grounds that the defendants were police officers and thus did not "use" the plaintiff's statements at trial.[22] Instead, the cases involve suits against the police and center on whether the requisite "use" at a criminal proceeding occurred. The cases do not question that the police may be held liable under § 1983 for violating someone's Fifth Amendment rights. *See Chavez*, 538 U.S. at 767; *Burrell v. Virginia*, 395 F.3d 508, 513-15 (4th Cir. 2005); *Renda v. King*, 347 F.3d 550, 557-59 (3d Cir. 2003); *Lingler v. Fechko*, 312 F.3d 237, 239 (6th Cir. 2002); *Deshawn E. v. Safir*, 156 F.3d 340, 346-47 (2d Cir. 1998); *Riley v. Dorton*, 115 F.3d 1159, 1164-65 (4th Cir.) (*en banc*), *cert. denied*, 522 U.S. 1030 (1997); *Giuffre v. Bissell*, 31 F.3d 1241, 1255-56 (3d. Cir. 1994); *Weaver v. Brenner*, 40 F.3d 527, 534-36 (2d Cir. 1994) (all involving § 1983 suits against police officers).[23]

The absence of a *per se* rule barring suits against the police for Fifth Amendment violations is not surprising; the Supreme Court has implicitly acknowledged the propriety of holding police officers liable for Fifth Amendment violations:

> The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. *Although conduct by law enforcement officials prior to trial may ultimately impair that right*, a constitutional violation occurs only at trial.

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (emphasis added); *see also Chavez*, 538 U.S. at 767 (quoting the same passage). It is hard to see how law enforcement officials could "ultimately impair" the right against self-incrimination if not by compelling a suspect to make incriminating statements that are later used against him at trial. It is equally hard to see how officials whose conduct ultimately impaired a citizen's Fifth Amendment rights could nonetheless escape civil liability merely because a different state official put the statements into evidence at trial. This is especially true since prosecutors are absolutely immune from suit when the conduct complained of relates to their role as advocates for the state in the judicial process. *E.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Burns v. Reed*, 500 U.S. 478, 485-86 (1991); *Higgason*

---

[22] Nor was the district court apparently aware of such precedents; the court offered no authority for its conclusion that because only prosecutors "use" statements at trial, police officers cannot face liability. *See* J.A. at 273 (Dist. Ct. Op.).

[23] The Supreme Court's holding in *Chavez*, that use of a coerced statement in judicial proceedings against the plaintiff is a prerequisite to § 1983 liability, does not resolve the question of who the proper bearer of such liability would be. Indeed, no member of the Court questioned the propriety of *who* the plaintiff sued in that case (the police officer) so much as disapprove of *what* the plaintiff sued *about* (the coercion itself, without use in a judicial proceeding). *See Chavez,* 538 U.S. at 768-71. We note that a district court in California recently observed, in *dicta*, that victims of coercive police questioning may not sue the questioning police officers under § 1983 *even if* their involuntary statements are used at trial because it is the prosecutor who introduces the statements and the judge who admits them into evidence. *Crowe v. County. of San Diego*, 303 F. Supp. 2d 1050, 1091-92 (S.D. Ca. 2004). As is clear from our discussion, we find this reasoning unpersuasive. In *Crowe*, the court's holding was that the plaintiffs' action was barred under *Chavez* because their statements were used only at a grand jury proceeding and at a hearing to determine whether they would be tried as adults or juveniles. *See id*. at 1088-90.

*v. Stephens*, 288 F.3d 868, 877-78 (6th Cir. 2002). Such immunity exists even when it is alleged that a prosecutor knowingly presented false evidence against the plaintiff at trial. *Buckley*, 509 U.S. at 272-73; *see also Imbler v. Pachtman*, 424 U.S. 409, 429-31 (1976); *Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003). It follows that a rule barring suits against the police for Fifth Amendment violations is a rule barring *any* suits for Fifth Amendment violations. But it cannot be that invasions of the right against compelled self-incrimination are not actionable. The Fifth Amendment's protection against self-incrimination, like the Fourth Amendment's protection against unreasonable searches and seizures, is explicit and personal. Just as people may file suit under § 1983 to redress deprivations of the latter protection, so may they sue to redress deprivations of the former.

One might think *Chavez* precludes our conclusion because it makes clear that the right against compelled self-incrimination is not violated until incriminating statements are used in a criminal proceeding. But this interpretation of *Chavez* is untenable, not least because it was obvious in *Chavez* that no criminal proceeding had occurred. We read the Fifth Amendment's requirement that a plaintiff's statements be used in a criminal proceeding as essentially one of standing. Where such use of the statements has not occurred, the plaintiff may not sue because he has not suffered the injury against which the Fifth Amendment protects. Where such use has occurred, however, there is no reason to preclude the plaintiff from suing the state officials who actually compelled him to incriminate himself in a clearly unconstitutional and objectively unreasonable way. This is not to say that the plaintiff is relieved of having to show causation. Returning our attention to the case before us, we conclude that for purposes of surviving Defendants' motion for summary judgment, McKinley has done so.

"[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to a deprivation of his constitutional rights." *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (internal quotation marks and citation omitted). Causation in the constitutional sense is no different from causation in the common law sense. Indeed, "[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). Thus the Supreme Court rejected the proposition that a police officer who applied for a warrant without probable cause could escape liability for the ensuing arrest merely because the warrant was supplied by a judge. *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986). In *Malley*, the defendant police officer argued that "the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest." *Id*. The Court said that the officer's "'no causation' rationale in this case is inconsistent with our interpretation of § 1983 . . . Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link." *Id*. The same reasoning applies to the present case. Officer Fortney, it is alleged, compelled McKinley to incriminate himself. Fortney took these actions pursuant to an ongoing official investigation. A special prosecutor was appointed. Fortney turned the statements over to the prosecutor and when the prosecutor introduced the statements at McKinley's trial, he did so through Fortney, who was on the witness stand. Viewing the facts in the light most favorable to McKinley, we hold that the alleged deprivation of his constitutional rights – i.e., the use at trial of incriminating statements he was compelled to make – was a "natural consequence of [Fortney's] actions."[24] *Pape*, 365 U.S. at 187.

---

[24] The dissent asserts that Fortney cannot be held liable because his actions comported with *Garrity v. New Jersey*, 385 U.S. 493 (1967). This misses the point of *Garrity* and of McKinley's claim in this case. To comport with *Garrity*, a state employer who compels an employee to make incriminating statements must not only promise not to use those statements in a criminal proceeding against the employee, but must also *keep* that promise. McKinley's claim is that Fortney and his colleagues *broke* that promise by compelling him to incriminate himself under the false promise of *Garrity* immunity and by turning the incriminating statements over to the prosecutor, who then prosecuted McKinley for the very crimes about which McKinley was compelled to make incriminating statements. As we have discussed, McKinley has offered enough evidence of this claim to proceed to trial.

Our conclusion that Fortney may be held liable does not mean that causation will be easy to prove in every case. A police officer may defend on the grounds that he attempted to prevent the use of the allegedly incriminating statements at trial, or that he never turned the statements over to the prosecutor in the first place. Such a defense would be of no avail to Fortney, who turned McKinley's statements over to the prosecutor, took the stand at McKinley's trial, and testified about McKinley's having made the statements. But the availability of such a defense insures that liability will befall only those state actors whose conduct caused the constitutional injury at hand.

With these principles in mind, we reject the district court's position that the police may never be liable for violating someone's Fifth Amendment rights. We hold instead that in actions brought under § 1983 for alleged violations of those rights, "it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes the violation of the [Fifth Amendment] privilege. In other words, while there may be no cause of action for the wrongful procurement of *unused* incriminatory statements . . . *it is the wrongful procurement . . . that forms the basis for* liability." *Williams v. Fedor*, 69 F. Supp. 2d 649, 676 (M.D. Pa. 1999), *aff'd without opinion*, 211 F.3d 1263 (3d Cir. 2000).

**3.**

We now turn to whether the right McKinley asserts in this action – the right not to be compelled by his superiors, who are state officials, to make incriminating statements that are later used against him at trial – was clearly established at the time of McKinley's second interview. We hold that it was.

We are mindful that determining whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is precisely what we have done. We have stressed that the facts – viewed in the light most favorable to McKinley – present a straightforward case of forced self-incrimination: Internal affairs investigators suspect that a police officer lied when asked, during an interview conducted as part of an official investigation, about his knowledge of or participation in alleged police misconduct. The investigators are aware that lying under such circumstances is a crime. The investigators order the officer to appear for a second interview and compel him to admit, both expressly and by implication, that he did indeed lie in the initial interview. Finally, the state uses these statements against the officer in a criminal trial for lying during the initial interview, i.e., for falsification and obstructing the internal affairs investigation.

On these facts, the contours of the Fifth Amendment's right to be free from forced self-incrimination are "sufficiently clear that a reasonable official would understand that what [the investigators did] violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). We decline to adopt the view of qualified immunity advanced by Defendants and the district court, namely, that since "there is no federal case on point," J.A. at 278 (Dist. Ct. Op.), Defendants are immune from suit. The Supreme Court's response to this argument is well-suited to the circumstances of this case: "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985)). In cases where courts have dismissed Fifth Amendment suits against state employers on qualified immunity grounds, they have done so because the complaining employees did not allege that they had been subjected to the kind of compulsion and subsequent prosecution proscribed by *Garrity* and its progeny. *See Chan v. Wodnicki*, 123 F.3d 1005, 1008-10 (7th Cir. 1997), *cert. denied*, 522 U.S. 1117 (1998) (holding that a police department's after-the-fact transfer of an officer who invoked his Fifth Amendment privilege before a grand jury did not amount to the

type of compulsion that is prohibited under *Garrity* and similar cases); *Singer v. State of Maine*, 49 F.3d 837, 845-47 (1st Cir. 1995) (holding that a state tax bureau's after-the-fact dismissal of an employee who refused to answer possibly incriminating questions was not a violation of a clearly established right because the employee was not threatened with sanctions prior to questioning nor required to waive her Fifth Amendment privilege); *Wiley v. Doory*, 14 F.3d 993, 996 (4th Cir. 1994), *cert. denied*, *Wiley v. Mayor and City Council of Baltimore*, 516 U.S. 824 (1995) ("[A]lthough it is alleged that the officers made statements under the threat of job loss, these statements were not used against them in any criminal proceeding.").

In stark contrast to these cases, McKinley presents sufficient evidence for summary judgment purposes to suggest that he *was* compelled to incriminate himself in precisely the manner held unlawful by the Supreme Court in *Garrity*. The Court's holding in that case bears repeating: "We now hold that the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Garrity*, 385 U.S. at 500. Particularly in light of the defendants' obvious familiarity with *Garrity*,[25] we take issue with the district court's representation that "there is no federal case on point" because it is hard to imagine a case that could be more on point – in view of the facts before us – than *Garrity* itself. We conclude, therefore, that Defendant Fortney is not entitled to qualified immunity.[26]

Finally, we address the criticisms of our dissenting colleague. The dissent suggests that Officer Fortney should be entitled to qualified immunity because we have established a "new right of action." We are unclear how, but it makes no difference since in no sense is McKinley's right to sue Fortney "new." The dissent cannot mean that the use at a criminal proceeding requirement is new. In *Chavez*, the Court was asked whether the Fifth Amendment right against self-incrimination was truly as broad as the Ninth Circuit had interpreted it, which is to say, as a right not only against the use of one's self-incriminating statements in a criminal case but a right against being coercively questioned in the first instance. *See Chavez*, 538 U.S. at 765-68. *Chavez* established a new rule of law only in the sense that it *limited* the right to sue for Fifth Amendment violations to *only* those cases in which such suits were *already* permissible under clearly established law, i.e., cases in which the plaintiff's incriminating statements had been used in a prior criminal proceeding.

If the dissent means that our holding is "new" because we have sustained, at the summary judgment stage, a § 1983 action against a police officer on the allegation that he compelled the plaintiff to incriminate himself, we can only conclude the dissent misapprehends the nature of qualified immunity. The doctrine of qualified immunity does not mean that a state actor is qualifiedly immune unless the plaintiff can point to a prior case in which judgment was entered against the same type of state actor on the same facts.[27] As we said recently: "Officials do not enjoy

---

[25] Recall that Fortney repeatedly discussed the rule of *Garrity* in his deposition; he and Goldsmith explicitly told McKinley that *Garrity* applied in the second interview; and, finally, the immunity documents supplied in the first interview were clearly inspired by *Garrity* and its rationale.

[26] The issue whether the other individual defendants are entitled to qualified immunity is not before us because McKinley has not yet had an adequate opportunity to conduct discovery as to those defendants. *See* discussion *infra* Part I.D. If on remand McKinley discovers and produces sufficient evidence that other individual defendants violated his right not to be compelled to incriminate himself, it will be the task of the district court to determine whether those defendants are entitled to qualified immunity.

[27] As it happens, there *is* a case where judgment was entered against a police officer in a § 1983 action for violating someone's Fifth Amendment right against self-incrimination. *See Griffin v. Strong*, 983 F.3d 1540 (10th Cir. 1993). The plaintiff was tried and the incriminating statements he was compelled to make were used at trial. *Id*. at 1541.

qualified immunity simply because the exact action in question has not previously been held unlawful by a court, but 'in light of pre-existing law the unlawfulness must be apparent.'" *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 901 (6th Cir. 2004) (quoting *Anderson*, 483 U.S. at 640). And as the Supreme Court said three terms ago: "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). With regard to the present case, pre-existing law makes apparent the unlawfulness of compelling someone to make incriminating statements that are later used against him at trial. Furthermore, as we discuss *supra* at Part I.C.2 of this opinion, there is no holding to the effect that Fifth Amendment violations are not actionable under § 1983. On the contrary, there are holdings to the effect that where the requisite use at a criminal proceeding occurs, a right of action against the police may be had. *See*, *e.g*., *Weaver v. Brenner*, 40 F.3d 527, 534-35 (2d Cir. 1994); *Deshawn E. v. Safir*, 156 F.3d 340, 345-47 (2d Cir. 1998); *Giuffre v. Bissell*, 31 F.3d 1241, 1255-56 (3d Cir. 1994); *see also Griffin v. Strong*, 983 F.2d 1540, 1543-44 (10th Cir. 1993).

Accordingly, we hold that a reasonable officer would understand that what Fortney and his colleagues are alleged to have done violates the Fifth Amendment right against self-incrimination. *Anderson*, 483 U.S. at 640.

## D.

Although we hold that police officers may face liability under § 1983 for violating suspects' Fifth Amendment rights and that McKinley has presented sufficient evidence on this score as to Defendant Fortney, it remains to determine whether any of the other officers named as defendants in this case, or the City of Mansfield, are entitled to summary judgment.

As is clear from our discussion *supra*, the evidence upon which McKinley relies centers exclusively on the second interview conducted by Defendant Fortney and his colleague, Lt. Goldsmith, who is not a defendant herein. As to the other individual defendants, all of whom are superiors to Fortney, McKinley merely hypothesizes liability for these officials, on the apparent theory that they must have participated in the alleged Fifth Amendment violation since they are "up the chain of command." *See* Brief of Appellant at 47-48 ("Fortney and anyone else up the chain of command who knew that the second interview was to take place and that [McKinley] was suspected of lying in the first interview, had an obligation to offer [McKinley] the protections of the Fifth Amendment."). State officials are liable under § 1983 only if their conduct "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution." 42 U.S.C. § 1983. Because McKinley does not support this hypothesis with record evidence tending to show that such higher-ups knew of the second interview or shared Fortney's alleged suspicion that McKinley lied in the first interview, we would ordinarily affirm the dismissal of his claims as against the other officer-defendants and the City. However, McKinley submits that the reason he can offer no evidence implicating the other individual defendants and the City in the alleged violation of his Fifth Amendment rights is that the district court granted summary judgment before affording him a sufficient opportunity to conduct discovery. *See Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (citation omitted) (holding that summary judgment is improper under such circumstances). We agree.

Defendants moved for summary judgment before any discovery occurred. McKinley responded with a motion seeking leave to conduct discovery and to hold in abeyance a decision on Defendants' motion for summary judgment until he conducted discovery and responded to

---

After the convictions were overturned, the plaintiff sued the police officer who compelled him to make the statements. The Tenth Circuit held, as a matter of law, that the officer had compelled the plaintiff to make the statements, reversed the district court's holding to the contrary and instructed the court to enter judgment in favor of the plaintiff. *Id*. at 1544; *Griffin v. Strong*, 827 F. Supp. 683, 685 (D. Utah 1993) (decision on remand).

Defendants' motion.  In his motion, McKinley specifically requested that he have an opportunity to "view the investigative file created and kept by the Mansfield Police during their internal 'scannergate' investigation" and to "depose the named defendants and possibly others whose names may appear in the investigative file." J.A. at 125-26.  The court's response was to permit McKinley only to "depose Defendant Officer Dale Fortney on whether he selectively recorded McKinley's statements in the second interview." *Id*. at 129 (Dist. Ct. Ord.).

By his motion for leave to conduct discovery, McKinley clearly fulfilled his "obligation to inform the district court of [his] need for discovery" prior to a decision on the summary judgment motion. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002).  Moreover, we note, McKinley objected to the court's limited discovery order in his motion in response to Defendants' motion for summary judgment and again requested additional discovery. *See* J.A. at 133.  He makes the same argument in his brief to this Court. *See* Brief of Appellant at 49.  Consequently, McKinley has preserved for appeal his claim that summary judgment was premature due to an inadequate opportunity to discover evidence regarding all of the defendants. *See Abercrombie*, 280 F.3d at 627 (citing *Vance*, 90 F.3d at 1149).[28]  We review such claims for abuse of discretion,  *see id*., and conclude that in this case, the district court abused its discretion because at the time of its highly restrictive discovery order, *no* discovery had occurred and the court offered no explanation for limiting discovery to only a deposition of Fortney, and regarding only his tactics during the second interview. *Compare Abercrombie*, *supra*, at 628 (upholding, in a case where substantial discovery had already occurred, a stay of discovery where the record showed that the specific additional material sought would be duplicative and the district court explained as  much in its order).

Accordingly, we hold that on remand the district court must grant McKinley a reasonable opportunity to conduct further discovery.  At a minimum, he should be entitled to any documents that are relevant to the constitutional injury he alleges and to depose the named defendants and anyone else reasonably likely to offer relevant information regarding the decision to interview McKinley a second time.  We express no view on whether such further discovery will be fruitful for McKinley's case.  At this early stage, it suffices for us to conclude that the district court erroneously limited McKinley's ability to discover evidence implicating Fortney's superiors and the City in the alleged Fifth Amendment violation in a case where he has presented sufficient evidence to withstand summary judgment regarding Fortney's liability for the alleged violation.

## II.  Malicious Prosecution

We now address whether – despite evidence that at least Defendant Fortney may have violated McKinley's Fifth Amendment rights – the district court nonetheless properly dismissed McKinley's claim that Defendants maliciously prosecuted him.  In evaluating McKinley's malicious prosecution claim, the district court first noted that prosecutors alone make the decision to prosecute and, furthermore, they are absolutely immune from civil liability for their prosecutorial decisions.  Second, the court cited this Court's decision in *Skousen v. Brighton High Sch*., 305 F.3d 520 (6th Cir. 2002), for the proposition that a police officer may not be held liable for malicious prosecution when he did not make the decision to prosecute.

The court further observed that there was no evidence suggesting that any of the defendants influenced or even participated in Prosecutor Knowling's decision to bring charges.  The court dismissed as "weak" McKinley's argument that the defendants should face §1983 liability for

---

[28] McKinley is not precluded from raising this claim merely because he cited only the summary judgment order in his Notice of Appeal. *See Abercrombie*, 280 F.3d at 627 n.3 ("That Abercrombie appealed only from the grant of summary judgment and not the order staying discovery is . . . of no moment.  A stay of discovery is not a final appealable order.").

passing "false" evidence (the tape and transcript of the second interview) to Knowling. The court's primary basis for dismissing this argument was that even without relying on the second interview, the evidence of falsification and obstruction of official business – which consisted of the discrepancies between McKinley's first statement and the statements of Nirode, Foster, and Noble – *at least* amounted to probable cause to charge McKinley with those offenses. Finding that no constitutional violation occurred and therefore seeing no need to proceed to the issue of qualified immunity, the court concluded its analysis of the malicious prosecution claim. We, too, are convinced that because there was probable cause – independent of the fruits of the second interview – to support the prosecution of McKinley, the malicious prosecution claim must be dismissed.

As the district court correctly held, the named defendants "cannot be held liable for malicious prosecution when [they] did not make the decision to prosecute [the plaintiff]." *Skousen*, 305 F.3d at 529. McKinley presents no evidence suggesting that defendants conspired with, influenced, or even participated in, Prosecutor Knowling's decision to bring charges against him.[29] *Skousen*, in which the plaintiff alleged that a police officer had falsely accused her, clearly forecloses a malicious prosecution claim based solely on officers' turning over evidence to the prosecuting authorities. *Id.*

In any event, even if McKinley *could* implicate defendants in the decision to prosecute, there was probable cause, independent of the contested second interview, to support the decision. While the state of the law of malicious prosecution is somewhat uncertain in this circuit, *see Darrah v. City of Oak Park*, 255 F.3d 301, 308-12 (6th Cir. 2001) (discussing confusion in the wake of *Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001)),[30] it nonetheless remains firmly established that where there is probable cause to prosecute, a § 1983 action for malicious prosecution will not lie. *Darrah*, 255 F.3d at 312; *see also Albright v. Oliver*, 510 U.S. 266, 273-75 (1994); *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999). Indeed, in *Darrah* we resolved the issue presented here in a straightforward manner: "[I]f this court finds that there was probable cause to prosecute [the plaintiff], regardless of any alleged false statements made by [the investigator at the probable cause hearing], then she cannot make out a malicious prosecution claim under the Fourth Amendment." *Darrah*, 255 F.3d at 312. Just as we did in *Darrah*, the district court below assessed the totality of the evidence implicating McKinley in the crimes for which he was charged, while disregarding the challenged second interview.

The district court's conclusion that probable cause existed is a legal question to be reviewed by this Court *de novo. See*, *e.g.*, *Darrah*, 255 F.3d at 312. In this case, the finding surely withstands review. At the time Knowling decided to charge McKinley with falsification and obstruction of official business – sometime after March 20, 2000, the date of the Foster statement – Knowling had at least the following unchallenged evidence at his disposal: Nirode's February 24 statement, which alleges that Foster told Nirode and McKinley about overhearing the Noble phone call on his scanner

---

[29] McKinley may not have been able to access evidence on this question due to limits the district court imposed on his ability to conduct discovery. However, because there was probable cause to prosecute, we need not determine whether the district court erred in limiting discovery as far as McKinley's malicious prosecution claim is concerned.

[30] In *Frantz*, a panel of this Court issued a puzzling opinion regarding the propriety of Fourth Amendment malicious prosecution claims. The panel interpreted the Supreme Court's plurality opinion in *Albright v. Oliver*, 510 U.S. 266 (1994) to mean that the Fourth Amendment could not serve as the basis for a § 1983 malicious prosecution action unless the plaintiff brings before the court additional allegations of violations of his Fourth Amendment right to be free from illegal seizures. *Frantz*, 245 F.3d at 875-77. The *Darrah* panel concluded that *Frantz*, a 2001 opinion, appears to contradict a 1999 opinion of this Court, which did not question the viability of an independent malicious prosecution action brought under § 1983. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999). The panel in *Darrah* determined that it was bound by *Spurlock*, under the rules of this circuit, but nonetheless evaluated and dismissed the plaintiff's claim under both the *Frantz* bright line approach and the traditional probable cause framework outlined in *Spurlock*. *Darrah*, 255 F.3d at 310-12.

and divulged the contents of the call; McKinley's February 25 statement (the first interview), which is materially inconsistent with Nirode's statement insofar as it denies that Foster said anything about the Noble call; Noble's February 29 statement, which confirms that Noble made the cell phone call in question; and finally, Foster's March 20 statement, which is consistent with Nirode's statement fact-for-fact, and therefore materially inconsistent with McKinley's first statement. These statements easily constitute "facts and circumstances . . . sufficient in themselves to warrant a man of reasonable caution in the belief," *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949), that McKinley committed falsification and obstruction of official business.[31]

In conclusion, we hold that because there was probable cause, independent of the statements he made at the challenged second interview, to prosecute McKinley, the district court properly dismissed McKinley's malicious prosecution claim.

## CONCLUSION

In sum, with respect to McKinley's claim that Defendants "compelled [him] in a criminal case to be a witness against himself," U.S. CONST. amend. V., we hold that McKinley has presented sufficient evidence to defeat summary judgment as to Defendant Fortney and that the district court prematurely granted summary judgment as to the other defendants because McKinley did not have an adequate opportunity to conduct discovery. Consequently, on this claim, we REVERSE and REMAND the case to the district court for proceedings consistent with this opinion. As to McKinley's claim that Defendants maliciously prosecuted him, we hold that probable cause supported the decision to prosecute. Accordingly, we AFFIRM the district court's entry of summary judgment on this claim. Finally, because we remand in part, we instruct the district court to reinstate McKinley's state law claims.

---

[31] Ohio's falsification statute provides: "No person shall knowingly make a false statement when . . . [t]he statement is made in any official proceeding . . . [or] the statement is made with purpose to mislead a public official in performing the public official's official function." OHIO REV. CODE § 2921.13(A)(1). As for obstruction of official business:

> No person, without privilege to do so and with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

*Id*. § 2921.31 (A).

---

### CONCURRING IN PART, DISSENTING IN PART

---

BRIGHT, Circuit Judge, concurring in part and dissenting in part. I concur in affirming the district court's entry of summary judgment as to McKinley's malicious prosecution claim. I, however, would affirm the district court's entry of summary judgment as to McKinley's Fifth Amendment claim to all appellees, including Officer Fortney.

McKinley concedes, and the rule is, that no Fifth Amendment violation occurs until the wrongfully obtained statement is introduced against a defendant in a criminal proceeding. *See Chavez v. Martinez*, 538 U.S. 760, 770 (2003) ("a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case."). Therefore, if McKinley's Fifth Amendment rights were violated, the violation occurred when the prosecutor introduced the transcript of the second interview at McKinley's trial.[1]

If, as the majority now holds, Officer Fortney might be deemed a participant in the violation, he would nonetheless not be liable. Even assuming a scenario in this case that Officer Fortney knowingly collaborated with the prosecutor to introduce the evidence in question at trial, that would not save McKinley's right of action. In this case Officer Fortney did not violate McKinley's privilege against self-incrimination in the interviews because he advised McKinley that the statements would not be used against him in any criminal proceedings. The interviews were properly conducted in accordance with the rule announced in *Garrity v. New Jersey*, 385 U.S. 493 (1967).

The remaining question is whether McKinley's Fifth Amendment right should be deemed violated when Officer Fortney turned the result of the interviews over to the prosecutor who introduced the statements at McKinley's trial. To hold Officer Fortney to have violated McKinley's Fifth Amendment privilege against self-incrimination by turning over this evidence would require the assumption that Officer Fortney could foresee that the prosecutor would offer the tainted evidence at trial, that defense counsel would not object, and that the trial judge would err in admitting the evidence.

The assumptions made above would create a new right of action, not previously decided by a court and not clearly established at the time Officer Fortney turned the evidence over to the prosecutor. As such, Officer Fortney should be protected by qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Moreover, the tainted evidence was rejected on appeal and the conviction overturned. That result could serve as a determination that McKinley's Fifth Amendment privilege against self-incrimination was not in fact violated. *Cf. Chavez v. Martinez*, 538 U.S. 760 (2003).

Accordingly, I would affirm as to Officer Fortney.

---

[1] A Fifth Amendment constitutional violation is different than a violation of the Fourth Amendment, where the violation occurs at the time of the improper search or seizure. *See Heck v. Humphrey*, 512 U.S. 477 (1994); *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir. 1999).